IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

**Lisa Knitter,**

        **Plaintiff,**

v.                                                                                               Case No. 11-1365-JWL

**Picerne Military Housing, LLC,**

        **Defendant.**

**MEMORANDUM & ORDER**

Plaintiff Lisa Knitter worked as a "handyman" for Lewis General Contracting, Inc. (LGC) from March 2010 through October 2010.[1]  During this time period, defendant Picerne Military Housing, LLC—a property management firm that provides housing to military members and their families—contracted with LGC to provide handyman services in housing units on Fort Filey in Fort Riley, Kansas.  Ms. Knitter performed handyman services on units managed by Picerne.  Ms. Knitter has now filed a lawsuit against Picerne asserting violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.  Specifically, plaintiff alleges that Picerne paid plaintiff lower wages than her male counterparts and that Picerne terminated her employment in retaliation for her complaints of sexual harassment and wage discrimination.  She further asserts that, after her termination, Picerne denied her application for vendor status based on her prior complaints of discrimination.

---

[1] Both parties in their submissions utilize the term "handyman" in a non-gender-specific fashion in describing plaintiff's position.  The court, therefore, adopts the parties' usage of the term in this respect.

Picerne moves for summary judgment (doc. 37) on a variety of grounds, but primarily contends that Ms. Knitter's wage discrimination and retaliatory discharge claims fail because Ms. Knitter was never employed by Picerne and that her retaliatory denial-of-vendor-status claim fails because Ms. Knitter was not applying for employment with Picerne as required by Title VII. As explained in more detail below, no reasonable jury could conclude based on the facts presented that plaintiff was employed by Picerne or that plaintiff applied for employment with Picerne. Summary judgment, then, is required in favor of Picerne on plaintiff's Title VII claims.

## I.     Facts

The following facts are either uncontroverted or related in the light most favorable to plaintiff, the nonmoving party. Plaintiff Lisa M. Knitter was employed by Lewis General Contracting, Inc. (LGC) from March 2010 through October 2010 as a handyman. LGC is owned and operated by Frank Lewis. Defendant Picerne Military Housing, LLC (Picerne) provides property management services for military housing on Fort Riley in Fort Riley, Kansas. Picerne contracts with outside vendor companies for many services, including handyman services. Picerne contracts with several vendor companies for handyman services, including LGC. Although LGC had other clients when Mr. Lewis first started the business in 2006, Picerne was LGC's only client during 2010. It is uncontroverted, however, that Picerne had no knowledge of whether LCG maintained other clients.

Fort Riley consists of six neighborhoods—Main Post, Peterson, McClellan, Ellis Heights. Colyer and Forsyth. Each neighborhood has one neighborhood manager and one maintenance

supervisor. With few exceptions, Picerne's own maintenance technicians performed handyman services in occupied housing units on Fort Riley and Picerne utilized vendor companies for handyman services associated with "turns." A turn is a process in which a housing unit recently has been vacated and is being prepared for a new occupant. The neighborhood maintenance supervisor walks through the vacated unit to determine the condition of the house and to ascertain what work needs to be completed before a new resident moves in. The maintenance supervisor fills out an initial walk sheet which is then used to prepare a work order list. Some neighborhood maintenance supervisors contacted the vendor company to ask that company to send handymen out to the base to assist with a turn; other supervisors contacted the handymen directly once a relationship was established. The record reflects that maintenance supervisors at Picerne frequently contacted plaintiff directly once she established herself at Fort Riley. Picerne pays a flat fee to LGC (or whatever vendor company it used for the turn) for every turn performed. LGC, then, paid its handymen after deducting a 15% "administrative fee" from the Picerne payment and also withholding FICA and Medicare withholding and applying federal and Kansas tax withholdings. Picerne, then, never directly paid plaintiff or any other handyman. Picerne paid LGC based on invoices LGC submitted to Picerne for work performed by LGC handymen.

The only formal training that Picerne provided to its vendors' handymen was a mandatory hazard awareness program that all Picerne subcontractors were required to attend for insurance purposes. This training included the proper use of safety harnesses, eye protection and hard hats. On occasion, the neighborhood maintenance supervisor would demonstrate to plaintiff how he wanted a particular task completed, such as repairing concrete on stairs or

3

repairing a door. LGC also did not provide formal training to its handymen as Mr. Lewis expected that his handymen would already be trained through general knowledge or past experience. Plaintiff testified that she came to her job at LGC already knowing how to perform most of the necessary tasks. In addition, plaintiff's husband trained her on certain tasks such as installing P-traps. Indeed, when Mr. Lewis hired plaintiff, he did so with the understanding that her husband (with whom Mr. Lewis was acquainted) had volunteered to assist her on the job. Mr. Knitter was not employed by LGC and had no desire to be employed by LGC. Mr. Lewis testified that he assumed that Mr. Knitter accompanied plaintiff on all of her assignments during her tenure with LGC and he never saw plaintiff turn a unit by herself. Plaintiff testified that her husband accompanied her to her jobs to further educate her on essential handyman tasks and so that he could show her how to perform certain handyman tasks.

When plaintiff arrived at a unit to perform a turn, she was provided with a box of necessary parts as well as a list of tasks that needed to be completed at the unit. The record reflects that plaintiff and her husband then performed their tasks largely unsupervised unless the Knitters needed assistance with a specific issue. If the Knitters discovered that additional work needed to be done at the unit, they contacted the neighborhood maintenance supervisor for permission to proceed with the additional work. After all crews completed their work on the unit (*e.g.*, handymen; painting; carpet crews), the maintenance supervisor conducted a walk-through of the unit to ensure that the unit was ready for new occupants and that all work had been properly completed. On occasion, plaintiff was called back to a unit because her work did not satisfy the neighborhood maintenance supervisor. Sometimes the maintenance supervisor would contact Mr. Lewis and advise him that his employee had not performed the work

satisfactorily (who, in turn, would contact the employee) and sometimes the supervisor contacted the handyman directly. On those limited occasions when plaintiff was notified that her work was not satisfactory, she was required to redo the work.

When the Knitters first began providing handyman services on Fort Riley, they assisted with turns in the McClellan neighborhood. During that time period, Chase Fleshman was the maintenance supervisor for the McClellan neighborhood. After only a few short weeks assisting with turns in the McClellan neighborhood, the Knitters stopped performing handymen services in that neighborhood after a dispute arose between the Knitters and Mr. Fleshman and Ben Kearns, the neighborhood manager. The nature and cause of the dispute is hotly contested by the parties—plaintiff claims that she was not paid for work that she performed and that she refused to return to the neighborhood; Picerne claims that the Knitters were dishonest and unruly and that Picerne advised Mr. Lewis not to send the Knitters to McClellan in the future. In any event, it is undisputed that no one at Picerne ever disciplined plaintiff in any way arising out of her work or conduct in the McClellan neighborhood. In fact, it is uncontroverted that no one at Picerne ever disciplined plaintiff over any matter.

The Knitters next performed handyman services in the Peterson and Ellis Heights neighborhoods. Those experiences also ended poorly, with both parties again disputing the nature and cause of the negative experiences. In the Peterson neighborhood, the Knitters worked with Rodney Hayworth, the neighborhood maintenance supervisor. The Knitters contend that Mr. Hayworth sexually harassed plaintiff and paid her lower fees based on her gender. Picernce alleges that the Knitters intentionally failed to perform tasks in Peterson units so that Mr. Hayworth would not meet his performance objectives and that their "antics" resulted

5

in delayed turns for new residents. In Ellis Heights, the neighborhood manager found that plaintiff did not complete her work in a timely fashion and that the Knitters were argumentative and confrontational. The Knitters contends that any negative experience in Ellis Heights was based on a "misunderstanding" with the neighborhood manager. Mr. Lewis testified that the Knitters were not welcome at three of the neighborhoods to which LGC had assigned her and that five Picerne staff members had complained about plaintiff to Mr. Lewis.[2]

On October 15, 2010, Brian Lamb, Picerne's Assistant Director of Maintenance Operations, called Mr. Lewis and asked him to no longer send plaintiff to Fort Riley. Because Mr. Lewis had no other positions available for plaintiff, he terminated her employment. Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II.   Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the court views the evidence and makes inferences in the light most favorable to the non-movant. *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Id.* (quoting *Anderson v. Liberty Lobby,*

---

[2] Plaintiff contends that Mr. Lewis's testimony on this subject constitutes inadmissible hearsay. It does not. Picerne has not offered Mr. Lewis's testimony to prove the truth of the substance of the complaints by Picerne staff members but to show Mr. Lewis's motive in terminating plaintiff's employment.

*Inc.*, 477 U.S. 242, 248 (1986)). Although the court views the evidence and draws reasonable inferences therefrom in the light most favorable to the nonmoving party, the "nonmoving party must present more than a scintilla of evidence in favor of his position." *Id*. (quoting *Ford v. Pryor*, 552 F.3d 1174, 1177-78 (10th Cir. 2008)).

## III.    Discussion

In the pretrial order, plaintiff contends that she was employed by Picerne and she seeks to hold Picerne liable for three separate Title VII violations. She contends that Picerne paid her lower wages than her male counterparts; that Picerne terminated her employment in retaliation for her complaints of sexual harassment and wage discrimination;[3] and that, after her termination, Picerne denied her application for vendor status based on her prior complaints of discrimination. Picerne moves for summary judgment on all three claims, contending primarily that the claims fail because Ms. Knitter was never employed by Picerne and never applied for employment with Picerne as required by Title VII.

*A.    Gender Discrimination and Retaliatory Discharge*

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of such individual's sex. 42 U.S.C. § 2000e-2(a)(1). It is also an unlawful employment practice "for an employer to discriminate against any of his

---

[3] Plaintiff does not assert a claim for sexual harassment.

employees . . . because he has opposed any practice made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3(a). An employer is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees." 42 U.S.C. § 2000e(b). An employee, in turn, is defined as "an individual employed by an employer." 42 U.S.C. § 2000e(f). Given this statutory framework, plaintiff, to establish her claims under Title VII, must prove that Picerne was her employer. *See Lockard v. Pizza Hut, Inc*., 162 F.3d 1062, 1069 (10th Cir. 1998).

The court begins by ascertaining the appropriate test to apply in determining whether plaintiff was an employee of Picerne. Both parties would have the court first utilize the "hybrid" test that distinguishes an employee from an independent contractor as adopted by the Tenth Circuit in *Oestman v. National Farmers Union Ins. Co*., 958 F.2d 303, 305 (10th Cir. 1992). According to Picerne, an application of that test demonstrates as a matter of law that plaintiff was not employed by Picerne; plaintiff contends that the hybrid test demonstrates, at a minimum, that factual issues exist concerning whether she was employed by Picerne. The court believes that the hybrid test does not provide an appropriate framework in light of the uncontroverted facts here, where there really is no dispute that plaintiff was employed by LGC and the only remaining question is whether plaintiff was also employed by Picerne. Under these circumstances, the court believes that the Circuit would apply the "joint employer" test articulated in *Bristol v. Baord of County Comm'rs*, 312 F.3d 1213, 1217-18 (10th Cir. 2002) (hybrid test inappropriate when trying to determine which of two entities was a plaintiff's employer under Title VII; joint employer test appropriate where plaintiff is employed by one entity and seeks to hold another entity liable as joint employer).

8

In deciding to apply the joint employer test in lieu of the hybrid test, the court notes that plaintiff, in her summary judgment response, expressly contends that LGC and Picerne are joint employers (albeit after engaging in the hybrid test). Moreover, while plaintiff at times in her brief purports to controvert that she was employed at all by LGC, she concedes as much by (in addition to making the joint employer argument) failing to controvert the following key facts: That plaintiff "was a handyman for LGC;" that she "solicited LGC's Mr. Lewis for a job;" that Mr. Lewis "hired Ms. Knitter based on the understanding that Mr. Knitter would assist her;" that Mr. Knitter "often 'assisted' Ms. Knitter with her work while she was employed by LGC;" and that LGC applied federal and Kansas tax withholdings from Ms. Knitter's paychecks as well as FICA and Medicare withholdings from her paychecks.  It is beyond dispute, then, that plaintiff was employed by LGC.  For this reason, the court believes that the sole remaining question is whether plaintiff was also employed by Picerne as a joint employer and not whether plaintiff was an independent contractor of Picerne.  See Bristol, 312 F.3d at 1218 (Unlike the hybrid test, the joint employer test is "designed for situations where there is more than one alleged employer.").  The court proceeds then to analyze whether Picerne can be considered plaintiff's employer under the joint-employer test.[4]

Courts applying the joint-employer test treat independent entities as joint employers "if the entities 'share or co-determine those matters governing the essential terms and conditions of

---

[4] Neither party suggests that the single-employer test set forth in *Bristol* has application here and the facts do not support an application of that test.  The single-employer test "asks whether two nominally separate entities should in fact be treated as an integrated enterprise, while the joint-employer test assumes that the alleged employers are separate entities."  *Bristol*, 312 F.3d at 1218.

employment.'" *Bristol*, 312 F.3d at 1218 (quoting *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1360 (11th Cir. 1994)). In other words, "courts look to whether both entities 'exercise significant control over the same employees.'" *Id*. (quoting *Graves v. Lowery*, 117 F.3d 723, 727 (3d Cir. 1997)). Most important to control over the terms and conditions of an employment relationship is the right to terminate that relationship. *Id*. at 1219.

The court begins, then, with an examination of the facts concerning whether Picerne exercised "significant control" over the terms and conditions of plaintiff's employment. Viewing the evidence in the light most favorable to plaintiff, no reasonable jury could conclude that Picerne exercised the requisite control over plaintiff to be deemed plaintiff's employer. It is uncontroverted that Picerne never disciplined plaintiff in any respect and that Picerne exercised very little supervision over plaintiff's work. While Picerne obviously told plaintiff what tasks needed to completed in each unit, Picerne's maintenance supervisors demonstrated those tasks to plaintiff or assisted with those tasks only when asked by plaintiff. Moreover, Picerne's supervisors asked plaintiff to "re-do" tasks on only a handful of occasions after conducting a walk-through of the property after all tasks had been completed. Thus, while Picerne supervisors may have evaluated plaintiff's overall performance in the course of conducting walk-throughs, there is no evidence that these supervisors directed or controlled plaintiff's performance on a daily basis.

It is also undisputed that Picerne never paid plaintiff for any work—it paid LGC. Plaintiff contends that LGC was simply a "pass through" and that, in reality, Picerne was paying plaintiff for her services. No reasonable jury could draw that inference from the facts presented. The evidence reflects only that Picerne pays for the services provided by LGC employees and

that it is LGC's sole responsibility to pay wages to its employees. With respect to the right to terminate plaintiff, plaintiff highlights that Picerne maintained the right to request that certain handymen not be sent to certain neighborhoods or, as it did with respect to plaintiff, to request that a specific handyman not be sent to Fort Riley at all. While it is undisputed that Picerne asked LGC not to send plaintiff to Fort Riley, there is no evidence that anyone other than LGC had any control over the firing of plaintiff from LGC. It is undisputed that Mr. Lewis alone had the ability to terminate plaintiff's employment—a right that he exercised when he had no other work assignments for her.

The court's conclusion is based in part on the Tenth Circuit's decision in *Zinn v. McKune*, 143 F.3d 1353 (10th Cir. 1998). In *Zinn*, the plaintiff was employed by a private corporation that had contracted with the Kansas Department of Corrections to provide medical services to inmates. *Id*. at 1355. The plaintiff sued the Department of Corrections under Title VII, § 1983 and various state laws. *Id.* The district court granted summary judgment in favor of the Department on the grounds that the plaintiff had presented "no evidence from which a trier of fact could conclude that [Ms. Zinn] was an employee of the [Department] for Title VII purposes." *Id*. The Tenth Circuit affirmed that decision. *Id*.

Although the Circuit in *Zinn* analyzed the issue using the "hybrid" test and common law agency principles, its analysis nonetheless is relevant to and provides context for the determination here, particularly as the Circuit in *Zinn* was faced with arguably joint employers and, in that regard, analyzed the amount of control exercised by the Department over Ms. Zinn's work. *See id*. at 1357-58. On appeal, the plaintiff argued that she was terminated by the Department, indicating that the Department was her employer. *Id*. at 1358. The Circuit rejected

11

that argument, concluding that the fact that the Department exercised its contractual right to request the removal of plaintiff (or any other personnel with whom it was dissatisfied) did not render plaintiff an employee of the Department. *Id*. In concluding that summary judgment was proper, the Circuit noted that despite the contractual provision permitting the Department to request the removal of plaintiff, "the record is undisputed that [the private corporation] alone retained the ability to terminate Ms. Zinn, indicating the Department was not her employer." *Id*.

The court is particularly persuaded by the Circuit's opinion in *Zinn* because the facts tending to show joint employment in *Zinn* were much stronger than those here and the Circuit nonetheless affirmed the grant of summary judgment. In *Zinn*, the Department's manual of internal management policy and procedure expressly treated employees of contractors as Department employees. *See id*. at 1362 (Briscoe, J. concurring). The Department had acted on the plaintiff's internal EEO complaint as though she were its employee. *Id*. In addition, a Department employee participated in the plaintiff's interview with the private corporation and a Department employee exercised considerable supervision over her daily work. *Id*. at 1361-62. Here, by contrast, Picerne never treated plaintiff as its employee, had no involvement in the hiring of plaintiff and did not exercise considerable supervision over her work.

For the foregoing reasons, the court concludes that no reasonable jury, presented with the facts in this record, could conclude that plaintiff was employed by Picerne for purposes of Title VII. Summary judgment on her claims of wage discrimination and retaliatory discharge is granted.

B.     *Retaliatory Denial of Vendor Status*

Finally, plaintiff contends that defendant denied her application for vendor status in retaliation for plaintiff's prior complaints of discrimination. The retaliation provision of Title VII protects from unlawful retaliation only "employees or applicants for employment." 42 U.S.C. § 2000e-3(a). Because plaintiff was not a former employee of Picerne at the time she submitted her vendor application in November 2010, she must come forward with evidence that she was an "applicant for employment" with defendant in order to state a claim in this context.[5] Because she has not done so, summary judgment in favor of defendant is warranted on this claim.

There is no evidence in the record that plaintiff, in November 2010, applied for employment with defendant and, in fact, the uncontroverted evidence establishes that plaintiff's business, Lisa's Handyman Service, sought a contractor-subcontractor relationship with defendant. The first page of the pre-qualification package submitted by plaintiff is a "Subcontractor Checklist" identifying "Lisa's Handyman Service" as the "subcontractor" submitting the package. The checklist indicates that Lisa's Handyman Service has submitted the requisite pre-qualification forms, including references and a W-9 form, as well as a certificate of general liability insurance and recent financial statements. The pre-qualification form itself states that Lisa's Handyman Service is a small business enterprise. The package also contains a confidentiality agreement between Lisa's Handyman Service (identified in the form agreement as the "bidder") and defendant (identified in the form agreement as the "contractor") and

---

[5] If plaintiff had been employed by Picerne previously, she could have brought a retaliation claim against Picerne as a former employee despite the fact that she sought a contractor-subcontractor relationship to which the protections of Title VII did not apply. *See Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1263-64 (10th Cir. 2007).

describes the confidential nature of bid documents regardless of whether the bidder is "awarded the Subcontract for which it is bidding." Nothing in the pre-qualification package, then, remotely suggests that plaintiff herself sought an employment relationship with defendant.

Similarly, defendant's written response to the prequalification package suggests only that Lisa's Handyman Service was seeking subcontractor status with defendant. In his December 7, 2010 letter to plaintiff, Gary Bertrand, identified in the letter as defendant's "Director" of "Small Business/Subcontractor Recruitment," advised plaintiff that defendant was not adding "new subcontractors in the trades that your company performs" and that defendant continuously attempts to balance "the number of subcontractors that work for us with the amount of current and projected work that we have for them." Plaintiff did not even testify in her deposition that she was attempting to seek employment with defendant in November 2010—she testified that she filled out paperwork to become a "vendor." She further testified that she understood she had to maintain liability insurance in order to perform work for defendant.

Based on the evidence in the record, no reasonable jury could conclude that plaintiff applied for employment with defendant in November 2010. Because plaintiff has come forward with no evidence showing that she is entitled to the protections of Title VII's retaliation provision in connection with the vendor application she submitted to defendant, summary judgment in favor of defendant is granted on this claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. 37) is **granted**.

**IT IS SO ORDERED.**

Dated this 3rd day of January, 2013, at Kansas City, Kansas.

<u>s/ John W. Lungstrum</u>
John W. Lungstrum
United States District Judge
